UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN (Green Bay)

UNITED STATES OF AMERICA.

Plaintiff,

v. Case No. 19-CR-00054-WCG-2

RONALD J. FRECHETTE, JR.

Defendants.

**DEFENDANT'S SENTENCING MEMORANDUM**

## I. Background

In the Fall of 2016, Ronald Frechette, Jr., together with his long-time companion, co-defendant Kelly Nacotee, were addicted to the opioid pain medication Percocet. [PSI: ¶¶80, 84, 100]. Frechette was only a purchaser and user of the pills, neither a wholesaler nor retailer. The retailer on the Menomonee Indian Reservation was co-defendant Alissa Waupoose. [PSI: ¶¶15, 17, 18, 23].

Waupoose would travel to Milwaukee to obtain the pills, and word got out that she was obtaining pills with a punch. [PSI: ¶¶15-18]. As most everyone on the Reservation then fancying these pills, Frechette was supplied by Waupoose, as was 23-year old Scott Perez. [PSI: ¶¶17, 22, 23]. Mr. Perez was bedridden and a quadriplegic as a result of a spinal injury sustained in a 2001 car accident. [PSI: ¶¶12, 27]. Particularly fond of the Percocet pills, Mr. Perez was supplied a pill directly by Waupoose at least three (3) times on the day of his death. [PSI: ¶¶15, 17, 18].

Late in the evening of September 12, 2016, Mr. Perez was contacting friends to contribute money for a pill, and trying to hunt down Waupoose who was leery that Mr. Perez would want a bargain of some sort for his fourth pill of the day. [PSI: ¶¶19, 22]. Mr. Perez contacted Frechette for funds for a pill. [PSI: ¶20]. Frechette did not have money to provide Mr. Perez to pay Waupoose, but Frechette had an idea to do the running for Waupoose. [PSI: ¶¶20, 23]. Frechette would obtain a pill from Waupoose, bring it to Mr. Perez in exchange for the purchase price of $40, run that money to Waupoose, and for his effort get a pill for himself on the front, *i.e.* money to be paid later, from Waupoose. [PSI: ¶23].

The former part of the brokerage deal went through with a fatal consequence, the latter did not. *Id.* Mr. Perez, assisted and joined by friends at his house with the ingestion in his system of his fourth pill of the day that was brought to him by Frechette, perished. [PSI: ¶¶12, 16-19]. Waupoose could not be found. Toxicology reports concluded Mr. Perez died from Furanyl Fentanyl toxicity [PSI: ¶12], and had a trace of cocaine metabolite.

Mr. Perez's friends identified Waupoose as a frequent visitor providing pills to the Perez home. [PSI: ¶17]. The friends identified Frechette as the last person to bring a pill to the house before Mr. Perez died. [PSI: ¶19].

Waupoose has consistently denied culpability. [PSI: ¶25]. So too did Frechette, initially. [PSI: ¶20]. The two (2) were indicted for distribution of Furanyl Fentanyl Causing Death and Second-Degree murder by a federal grand jury on March 26, 2019, two and one-half (2.5) years after Mr. Perez's death. [PSI: ¶1; R. 1]. Frechette finally told

the truth of precisely what he did, and the role of Waupoose. [PSI: ¶¶22-23]. Frechette has pleaded guilty to involuntary manslaughter, contrary to 18 U.S.C. §§ 1112 and 1153(a). [PSI: ¶4; R. 44, 46]. He faces a statutory maximum penalty of eight (8) years imprisonment. [PSI: ¶116]. The applicable advisory United States Sentencing Guideline range is 24 to 30 months. [PSI: ¶117]. Waupoose has entered a plea of guilty to distribution of a Schedule II controlled substance, not involving death. [PSI: p. 2, ¶25; R. 56, 57, 58]. Whiles she faces a statutory maximum penalty of 20 years imprisonment, her anticipated, applicable advisory Guideline range, based upon a total offense level four (4), is reportedly 0 to 6 months when she is sentenced on March 3, 2020. [R. 56: 2, 4-5].

Frechette's plea agreement calls for the government to recommend a term of 48 months imprisonment. [PSI: ¶8]. The government will recommend 60 months imprisonment for Waupoose. [R. 56: 22].

Frechette recommends a sentence at the high end of the applicable Guideline range, 30 months, reduced by the six (6) months he served for revocation of probation in Shawano County Circuit Court case number 14-CF-194, that March 2017 revocation occasioned by Frechette's involvement in the instant offense. [PSI: ¶59]. The net defense sentence recommendation of 24 months imprisonment should be followed by the statutory maximum three (3) year term of supervised release. [PSI: ¶119]. Frechette has no objection and waives reading in open court of the proposed supervised release conditions referenced in the Presentence Investigation report. [PSI: ¶132]. Since he does not have the financially eligibility to pay a fine [PSI: ¶125], he asks the Court waive any fine. Frechette shall be ordered to pay restitution reflecting the funeral

expenses of Mr. Perez- which he moves be set jointly and severally with co-defendant Waupoose- totaling $3,392.61. [PSI: ¶¶31,126]. That should be ordered to be paid at a rate of not less than $100/month or 10% of Frechette's net monthly earrings, whichever is greater. [PSI: ¶132, p. 29].

## II. Discussion

### A. Nature and circumstances of the offense

The conduct of Frechette resulted in the death of another, so the seriousness of the offense is clear. While the defendant is statutorily eligible for a probation sentence [PSI: ¶121], such a sentence would depreciate the seriousness of the offense. Nevertheless, the elements of the offense for which Frechette has been convicted reveal that a lengthy period of incarceration is not just.

The government initially charged Frechette in Count One of the Indictment with distribution of a mixture and substance containing Furanyl Fentanyl, an analogue of a Schedule II controlled substance, which carries a statutory minimum mandatory penalty of 20-years imprisonment, contrary to 21 U.S.C. §841(b)(1)(C). [PSI: ¶¶1, 118; R. 1: 1]. In the alternative, in Count Two, the government charged Frechette with second-degree murder, which is murder with malice aforethought, and carries a statutory maximum term of life imprisonment, contrary to 18 U.S.C. §1111(a). [PSI: ¶¶1, 118; R. 1:2]. Eschewing the trend in the criminal justice system that charging is sentencing, and recognizing Frechette's actual role in the offense, the government elected to dismiss the

Indictment in favor of an Information that charges Frechette with involuntary manslaughter for the death of Mr. Perez, contrary to 18 U.S.C. § 1112. [ [PSI: ¶4; R. 44].

The essential elements of that offense are that Mr. Perez's death was the result of an act done by Frechette during the commission of a lawful act done in an unlawful manner or without due caution which might produce death, and that Frechette knew of circumstances that would reasonably cause him to foresee his conduct might be a threat to the life of Mr. Perez. [R. 43: 4-5]. In the offense of conviction, there is neither a willful, deliberate, malicious or premeditated threat, violent act or assault; any premeditated design maliciously or otherwise unlawfully to effect death, let alone injury; nor any sudden quarrel or heat of passion. There is neither antisocial nor hostile purpose. [PSI: ¶33]. There is no abandoned and malignant heart. It is reckless conduct, bordering on negligent, without the aggravating element of depraved indifference to human life. *See* Guideline §2A1.4, Application Note 1 ["Reckless" means a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable persons would exercise in such a situation. "Criminally negligent" means essentially the same, minus awareness of the risk, but which is not reckless. "Reckless includes all, or nearly all, convictions for involuntary manslaughter under 18 U.S.C. §1112]; [*see also* PSI: ¶35] Frechette argues that there was no awareness of a *substantial* risk of death. Mr. Perez was a friend of Frechette and his extended family. *Id.* Frechette was not among those many people who Mr. Perez's grandmother describes as "tak(ing) advantage of (Mr. Perez's) graciousness" and among those who "started using

drugs" with Mr. Perez. [PSI: ¶28]. Frechette regarded the life of Mr. Perez as valuable, reflected by his return to the residence where he delivered Mr. Perez the pill upon learning of his distress. [PSI: ¶24]. This is not close to the typical case where the drug provider administers and leaves the overdosed drug user alone to die.

Frechette was not a trafficker of pills in the traditional sense of the legal term. Unlike co-defendant Waupoose, Frechette did not have the traditional dealer-seller relationship with the deceased. He did not provide the poisonous pill to Mr. Perez to make money, to profit from the misery of another, rather to feed his own addiction for the opiate. Frechette was supporting his own habit by coordinating an exchange for another whom he knew was also addicted. [PSI: ¶¶20, 23]. The subject transaction was not about a predatory drug dealer or about ruthless profit; it was about survival in the moment. While Frechette believed he was giving Mr. Perez some relief and getting some for himself, the government has convicted him of being a killer. Society offered no compassionate resources to Mr. Perez while he was alive to help him overcome addiction. Efforts to admit him into inpatient treatment, to which he was seemingly amenable, fell flat because no facility was equipped to house and care for a quadriplegic. [PSI: ¶29]. Only after his death does society appropriately value his life.

Controlled substances are regulated primarily because of their dangers to health, and so it may seem to follow that any drug distribution is inherently dangerous. However, the contribution of victim behavior is worthy of discussion. The victim's grandmother reported that in the last year of his life, Mr. Perez started using drugs, became addicted, and she refused to give him cash due her belief he was spending it on

drugs. [PSI: ¶¶28, 29]. A canvass of the victim's residence uncovered a variety of drug paraphernalia, to include multiple smoking devices and an assortment of unidentified controlled substances. [PSI: ¶13]. Law enforcement's recovery of Mr. Perez's cell phone text records reveal that he was eager to obtain for use controlled substances. There was neither force nor coercion in the offense conduct. Frechette and Mr. Perez were both exercising their free will to get high from powerful Percocet pills, regardless of the danger. Mr. Perez was an experienced drug user, hell-bent on ingesting what Waupoose was selling, and he was going to get his pill from someone, if not Frechette. He was an addict and knew the risks by seeking out the pills he knew were strong. [PSI: ¶16]. On the day in question and previous days, Mr. Perez self-administered the pills; others, not Frechette, prepared the fatal pill for his ingestion; and others, not Frechette, used purchased pills with him. [PSI: ¶15-19]. Voluntary participation in drug abuse seems to undercut the drug provider's causal responsibility.

Unlike victims who resist rape or robbery, drug users have no legal right to endanger themselves. Voluntary drug users are arguably partners in crime. While drug users who overdose are likely to be addicts, with arguably compromised wills, the law should seek to distinguish between the dangers of wholesale drug trafficking that greatly exceeds the dangers of individual drug use from sharing drugs socially, as was essentially what was happening here. Where companions are sharing the risks of drug use it seems morally arbitrary to hold the survivor liable for an unlikely misfortune that could as easily have fallen on him. *See* "Making the Best of Felony Murder," Guyora Binder, 91 B.U. L. Rev. 403, p. 33.

While it is argued that Frechette neither demonstrated malignant recklessness concerning the lives and safety of others nor possessed a heart devoid of social duty and fatally bent on mischief, he did not report the truth of his role in the offense conduct that led to Mr. Perez's death until his Indictment, and instead directed the mother of his children to delete her cell phone contents, giving rise to the Indictment of Kelly Nacotee for Misprision of Felony. [PSI: p. 3, ¶¶20-24]. This was self-defeating conduct of the highest order because had Frechette come clean with what happened, he likely would have been spared prosecution. Those who actually participated in use with and essentially administered the fatal pill to Mr. Perez- including Darius Peters who on each delivery occasion placed the pill in tinfoil and lit it, causing it to burn and smoke, so that Mr. Perez could inhale the fumes through a tube placed in his mouth [PSI: ¶16]- were spared prosecution by their immediate report of what occurred. But by not telling the truth up front, Frechette compounded his culpability for imposing risk on Mr. Perez. But this did not amount to obstruction of justice [PSI: ¶33], and it is never too late to accept responsibility, as Frechette has done here. [PSI: ¶¶22-24, 33].

Large scale trafficking in dangerous, addictive drugs for profit is sufficiently dangerous to justify lengthy imprisonment. Trafficking in less dangerous, less addictive drugs is not. Nor is small scale possession even of dangerous and addictive drugs for personal use or social sharing. What about possession of Percocet, that contained a dangerous analogue unknown to the person, for personal use or social sharing? Drug offenses do not inherently involve violence, coercion, or destruction, and because their

dangers are so variable and context specific, this particular offense conduct should not be viewed as calling for a sentence greater than that proposed by the defense.

**B. History and characteristic of the defendant**

Frechette turns 40 years of age in a matter of days. [PSI: p. 2]. With the exception of an approximate five (5) to six (6) year stint in Black River Falls, Wisconsin and North Dakota, where he sought relief from his alcohol abuse on the Menominee Indian Reservation and to find employment, he has lived his entire life on the Reservation. [PSI: ¶77, 80 ]. He has no negative upbringing to blame for any malfeasance. [PSI: ¶¶78-79; 81-82].

Frechette obtained his HSED at age 18, and even earlier than that age began and maintained consistent employment in a variety of roles, including truck driver, dry waller, press operator, farmhand, lumber sorter, machine operator, and general laborer [PSI: ¶¶104, 106-112]. He will need to continue to work consistently to make timely restitution payments for the funeral expense of the family of Mr. Perez [PSI: ¶132, pp. 29-30], and support his family.

Frechette has had an exclusive relationship with Kelly Nacotee for nearly 25 years. [PSI: ¶¶80, 84]. Both her and Frechette have battled various substance abuse addiction issues during the course of their relationship, to include alcohol, cocaine, marijuana, and synthetic marijuana, and opiates for Frechette. [PSI: ¶¶84, 95-98, 100]. Notably, Frechette became addicted to gambling for a two (2) year period post-offense. [PSI: ¶92].

His criminal history, largely Menominee Tribal Court convictions not counted under the Guidelines, are exclusively domestic violence related with Kelly Nacotee, fueled by alcohol abuse, and relatively dated, ranging from 1997 to 2006. [PSI: ¶¶47, 48, 50, 54, 55, 56, 57, 58]. Since age 26 in 2006, Frechette has been fined for disorderly conduct during an argument with Kelley Nacotee on only one (1) occasion in 2015. [PSI: ¶60]. Frechette resolved his alcohol abuse- he has been alcohol and cocaine free for four (4) years- which resolved his domestic issues with Ms. Frechette, and the cause of other random misdemeanor criminal conduct. [PSI: ¶¶49, 51, 52, 53, 95].

Frechette's prescription opiate abuse, which gives rise to this case, commenced in 2014. [PSI; ¶100]. He because a volume user up to the date of the offense. *Id.* Post-offense, he ceased use, relapsing on two (2) occasions, one (1) upon getting wind of his imminent arrest in this matter. *Id.*

Before this case, Frechette had been convicted of one (1) felony offense in his lifetime, the 2014 Shawano County Burglary for which he was placed on probation. [PSI: ¶59]. That probation was revoked based upon the instant offense conduct, *Id.,* and the defendant served approximately six (6) months in jail.

Despite their historical domestic problems, Kelly Nacotee and Ron Frechette appear to be big fans of one another. [PSI: ¶¶84-85]. She describes him as a hard worker and driven to support their family. [PSI: ¶85]. Frechette helped raise a step-son as his own son. [PSI: ¶87]. The couple has four (4) children together, two (2) grown and two (2) ages 14 and 16. *Id.* Their lone son is employed as a Deputy with the Menominee County

Sheriff's Department. *Id.* The younger children miss their father, and the family intends to remain intact. [PSI: ¶¶86, 88].

Kelly Nacotee is wrong about one (1) matter. She believes Ron Frechette does not have any rehabilitative needs. [PSI: ¶86]. She apparently fails to understand and or acknowledge his clear history of various addictions and corresponding evident addictive personality, which could show its ugly head again without more than lip serve to adherence to supervision conditions. *Id.* That the couple's oldest daughter, Kaylean Frechette, age 22, has significant issues related to THC and prescription opiates abuse [PSI: ¶87] demonstrates the vigilance this family needs to maintain concerning their proclivity towards addiction.

The defendant himself understands that his use of drugs and alcohol have played a significant role in his criminal history. [PSI: ¶101]. Frechette has been under the influence of controlled substances, mostly alcohol, every time he has ever been arrested. *Id.* He will not survive federal supervised release and a return to prison is inevitable should he not seek the help necessary to remain free of each and every mind altering substance in existence. He expresses motivation to participate in treatment. [PSI: ¶102].

Frechette does sincerely appear to be historically focused on the support of his family. [PSI: ¶ 93]. He expresses focus now on sobriety of all types, which rids him of criminal thinking, and returns him to religious faith, his culture and mentorship. *Id.* There is nothing in the life history of Frechette that shows he places a low value on the lives of others or acts such that he expresses any indifference to human life.

Mr. Perez's grandmother appears to characterize Frechette's crying at a previous Court hearing as a selfish response to the prospect of going to jail. [PSI: ¶30]. Defense counsel's 10-month interaction with Frechette, together with counsel's recall that the timing of Frechette's emotions in Court were when discussing with the Court the factual basis for his guilty plea, suggests the grandmother's perspective is misplaced.

Frechette has been detained in the strict confines of the Brown County Jail since his March 28, 2019 arrest, a period of 10 months. [PSI: p. 1].

### C. Just punishment, respect for the law and deterrence

While not a required element of the offense of conviction, there was no acute awareness here of a substantial risk of death. Gross deviation from a standard of care aside, there was no reasonable notice of a substantial and unjustifiable risk that a proscribed fatal result would occur. The greater an actor's awareness of an incriminating circumstances or future harm, the more culpable the actor is and should be proportionately punished. The relevant Guideline commentary equates involuntary manslaughter with a homicide by intoxicated operation of motor vehicle. *See* Guideline §2A1.4, Application Note 1. Here, there was neither extreme indifference to human life nor awareness of the risk of actual fatality arising from the gross deviation from a reasonable standard of care that should be proportionately punished.

Motives and purposes matter in the law. Yet, the evaluation of ends also pervades the law. If the blame for harm is properly affected by the actor's aim as well as the actor's expectation, the sentencing recommendation proposed by the defense is well-

placed. Frechette deserves punishment for killing recklessly in the pursuit of an independent relatively benign purpose, but to a moderate degree.

While he initially demonstrated no respect of the law, Frechette did post-indictment, to the fullest degree.

With regard to effective deterrence, severely punishing the unintended consequences of intended dangerous conduct imposes a punishment lottery on the intended conduct. *See* 91 B.U. L. Rev. 403, p. 11, *supra*. For example, the felony murder rule subjects participants in predicate felonies to a small risk of a large penalty. *Id.* Yet we should expect to achieve a greater deterrence by increasing the certainty of punishment rather than its severity. *Id.*

**D. Protect the public from further crimes of the defendant and provision of needed correctional treatment in the most effective manner**

It has been argued that the likes of Frechette are charged in state and federal courts when the circumstances of buyers that are users of drugs and sellers that are users of drugs become tragic in the form of death, but it is hard to divide responsibility in an effort to protect the public.[1] Frechette has proven a sober Frechette is no danger to anyone.

While Frechette would be a proper candidate for the Bureau of Prison's (BOP) 500-hour Residential Drug Abuse Program (RDAP), the sentence proposed by the defense would not allow for same and a sentence fashioned to consider same is unlawful. *Tapia v. United States,* 564 U.S. 319, 331131 S.Ct. 2382, 180 L.Ed.2d 357 (2011) [the District

1 This argument is borrowed from one previously made by Associate Federal Defender Tom Phillip.

Court is precluded from imposing or lengthening a prison term in order to promote a criminal defendant's rehabilitation through completion of the BOP's 5000 hour RDAP]. The supervised release condition that he participate in a program of alcohol and drug testing to include up to six (6) urinalysis tests per month and residential or outpatient treatment for drug and alcohol abuse, as recommended by his supervision probation officer [PSI: ¶132, p. 29], is provision of critical correctional treatment in the most effective manner.

### E. Sentencing Guideline construct

The Guideline offense level is 18 for the offense of conviction. [PSI: ¶35]. That offense level considers reckless conduct as defined previously, and so does not depreciate the seriousness of Frechette's actual conduct.

The Guideline criminal history category is III based upon four (4) criminal history points associated with the one (1) prior 2015 Shawano County Felony conviction, for which probation status was revoked based on the instant offense. [PSI: ¶¶ 59, 61-63]. Since Frechette's Tribal Court convictions are greater than 10 years old, an argument criminal history category III substantially under-represents the seriousness of Frechette's criminal history or the likelihood he will commit other crime is misplaced. *See* Guideline §4A1.3(a). Other Frechette arrests not prosecuted are dated, ranging from 1997 to 2001. [PSI: ¶¶66-74].

While it may seem that a Guideline range of 24 to 30 months based upon an adjusted total offense level 15 and criminal history category III is too lenient here, as

expressed by Mr. Perez's grandmother [PSI: §31], the scoring by the Guidelines fits hand to glove to the proscribed criminal conduct and criminal history.

## F. Substantial Assistance to Authorities

While not timely, as not provided until after his indictment some two and one-half (2 1/2) years after the offense conduct, Frechette did provide significant, useful, truthful, complete, and reliable information concerning the investigation of Alissa Waupoose, who has committed a criminal offense related to Frechette's own. Frechette expressed his willingness to testify against Waupoose at her trial concerning her role in the death of Mr. Perez. He is prepared to suffer the danger or risk of injury resulting from his assistance to authorities. These are all factors that a Court considers when the government moves the Court to consider a variance from the applicable advisory Guideline range pursuant to substantial assistance to authorities. *See* United States Sentencing Guidelines §5K1.1. That the government has elected to not prosecute Waupoose for a homicide offense because "they do not have the forensic evidence to prove the pill that killed Mr. Perez was sold by Ms. Waupoose" [PSI: ¶25] - despite the fact she personally delivered three (3) pills to Mr. Perez the day he was killed and visited him more than 20 times for that purpose during the two (2) months preceding his death [PSI: ¶¶15-18] - should not preclude the Court from considering at sentencing Frechette's substantial assistance to authorities in the investigation of Waupoose. *United States v. Knox,* 573 F.3d 441, 453 (7th Cir. 2009) [a district court may consider a defendant's cooperation with the government as a basis for a reduced sentence, even if

the government has not made a §5K1.1 motion]; *United States v. Leiskunas,* 656 F.3d 732, 737 (7th Cir. 2011) [a district court may consider a defendant's cooperation with the government as a basis for a reduced sentence under 18 U.S.C. §3553].

Should the Court consider Frechette's cooperation with authorities to merit a two (2) offense level reduction to offense level 13, paired with criminal history category III, a Guideline range of 18 to 24 months presents.

## III. Conclusion

The sentence proposed by the defendant is one that is sufficient, but not greater than necessary, to comply with the factors to be considered in imposing sentence as set forth in 18 U.S.C. § 3553(a).

An aggregate sentence of 24-months imprisonment is rationally justifiable on the basis of a plausible conception of just deserts. Frechette was not squarely within a "person-endangering frame of mind" when he acted on the date in question. His general awareness and disregard of the risk created by his conduct constituted a deviation from a reasonable standard of care, but given the circumstances, barely a gross deviation that should be punished severely.

He has previously demonstrated his ability to handle his addictions and lead a pro-social life. He is not without good and now some seasoned perspective. His failure has been consistency. He is no longer subject to mere Tribal Court consequences for his lack of discipline to mind his addictive personality, rather now the federal Court. He is correspondingly deterred, and the community is protected.

Frechette asks the Court recommend to the federal Bureau of Prisons his placement at the Federal Correctional Institution at Oxford, Wisconsin.

Dated at Green Bay, Wisconsin on January 16, 2020.

Respectfully submitted,

/s/ Thomas G. Wilmouth
Thomas G. Wilmouth
WI State Bar No. 1011746
P.O. Box 787
Green Bay, Wisconsin 54305
[715] 525-1685 Telephone
[715] 598-6208 Facsimile
tom.wilmouth@gmail.com